FILED
2023 Apr-28  PM 12:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

|  |  |
|---|---|
| **DeMya Johnson**, | |
| Plaintiff, | Case No. 5:20-cv-02056-LCB |
| v. | |
| | **Plaintiff's Motion for Adverse Inference Against Charter (opposed)** |
| **Charter Communications, Inc., and Tranche Technologies, Inc.** | |
| Defendants. | Hon. Liles C. Burke |

## PLAINTIFF'S MOTION FOR ADVERSE INFERENCE AND DISCOVERY SANCTIONS AGAINST CHARTER COMMUNICATIONS, INC.

AND NOW, Plaintiff DeMya Johnson ("Plaintiff" or "Johnson") hereby files her Motion for Adverse Inference and Discovery Sanctions against Charter Communications, Inc. ("Charter").

## I.    CERTIFICATE OF PRE-MOTION CONFERENCE

I, Jacob U. Ginsburg hereby certify that I conferred with Abby Howd and Ryan Watstein, counsel for Charter, as reflected in the pre-motion letter submitted to Chambers on April 21, 2023. Charter disputes the basis for the motion because, *inter alia*, it contends it does not have control over the records at issue.

## II.    INTRODUCTION AND SUMMARY OF ARGUMENT

Charter became aware of its duty to assure Defendant Tranche Technologies, Inc. ("Tranche") preserved phone record in January of 2020.[1]  Despite the litigation hold in effect and the presence of Johnson's data in Charter's computer system as a "lead" entered into at the time of a phone call identified in her demand letter,[2] Charter did not obtain phone records from Tranche or even advise Tranche of the necessity to retain records as a result of Johnson's lawsuit against Charter.[3] Rather, Charter claimed it undertook a "thorough investigation" of Tranche's phone activity, yet accepted Tranche's false narrative based exclusively on the (doctored) recording.[4] Now, Tranche freely admits it doctored the much-discussed December 26, 2019 recording and further called DeMya Johnson on at least one occasion.[5]  Tranche also asserts it is without sufficient information to admit or deny the remaining 31 phone calls identified by Johnson, as it was never told by Charter about the litigation, or instructed to retain phone records.[6]

---

[1] *See* Ex. A, Johnson prelitigation demand letter dated January 24, 2020, partially redacted pursuant to FRE 408; *See* Ex. B, Johnson small claims suit against Charter dated February 24, 2020.

[2] Ex. B. Charter SOM lead data for Johnson.

[3] Ex. C, N.T. Manny Jones, Jan. 13, 2022,  p. 33:21-23.

[4] *Id.*, p. 48:11-12.

[5] Doc. No. 123, AD 8; Id., para 34-45.

[6] Doc. No. 123, AD: 2

Because of Charter's omission, Johnson is prejudiced.  Specifically, where it should be a stipulated fact that Tranche made 33 calls on behalf of Charter, there are only two stipulated calls and the other 31 calls are in dispute and must be determined by the jury.  Further, because Charter exhibited willful blindness and strategic opacity about Tranche's telemarketing activity, the "bad faith' requirement for an adverse inference has been met.  Finally, because Charter appears to benefit from a system of willful blindness about its resellers marketing activities, to decline to order an adverse inference would encourage Charter to continue its problematic approach. Accordingly, Plaintiff is entitled to an adverse inference.

## III.    RELEVANT FACTUAL BACKGROUND

### A. <u>Charter's relationships with "resellers"</u>

Charter contracts with various marketing companies it calls "retail partners" or "resellers" for the purpose of selling Spectrum cable and internet packages.  Ex. C, N.T. Manny Jones, pp.  16:7-18.  Charter pays "resellers' by commission based on the number of Spectrum subscribers enrolled.  As Charter's corporate representative explained, the more Spectrum subscribers the reseller enrolls, the more money Charter pays the reseller:

> Ginsburg: The more units a retail partner sells, the more commission it receives. Correct?

The Witness: The more accounts are connected, sold by the partners based on the rate card in the agreement, the partners are then paid accordingly.

Ginsburg: Okay. So when they sell more, their payment increases?

The Witness: Correct. When they sell more and the accounts are connected, then the payments will increase.

Ex. C, N.T. Jones, p. 110:12-21.

Charter's contracts with its resellers, including Tranche, provide that Charter has "audit rights" over the reseller to examine the reseller's compliance.  Ex. D, § 1.7.  While Charter purports to prohibit outbound telephone calls by resellers, it does not require its resellers to maintain phone records.  N.T. Jones, 33:21-23.

### B. **Tranche's Calls to Johnson and Charter's "thorough investigation"**

Much of this litigation has dealt with the dispute over the December 26, 2019 call, which Tranche now admits was altered to make it appear as Johnson placed the call rather than Tranche or Charter.  Doc. No. 123, AD: 8.  That December 26, 2019 call was made to Johnson from the number (800) 892-4357.  Ex. E, screenshot 12/26/2019.  In 2019 and 2020, Johnson received 14 other calls on behalf of Charter from that exact phone number as the aforementioned call.  Ex. E (calls on 11/21/2019, 11/25/2019, 11/28/2019, 12/3/2019, 12/5/2019, 12/16/2019, 12/20/2019, 12/26/2019, 10/8/2020, 10/10/2020, 11/3/2020, 11/4/2020, 11/6/2020

and 12/18/2020).[7]  Johnson received 18 other calls that all mentioned "Spectrum" and included the same pre-recorded message as the calls from (800) 892-4357.  *See generally* Doc. No 64-1.

Despite failing to review any phone records from Tranche and being presented with AT&T records from Johnson confirming a Charter number was *calling her*, Charter insisted its "investigation" did not uncover any telemarketing by Tranche.  See e.g. Doc. No. 57, ¶¶ 47-49.  Tranche claims not to know if it made any calls to Johnson beyond the two it now admits to placing in December 2019, because it did not retain records and did not know of any litigation until "September or October of 2021."  Doc. No. 123, AD: 2.  Charter conveniently does not require resellers to keep phone records and did not meaningfully seek any records from Tranche after Johnson sent a demand letter and then filed suit in small claims court.

Instead, Charter accepted at face-value, Tranche's story that Johnson called the Charter number.  Even in February of 2020, there was reason to doubt Tranche's story, as Johnson attached the screenshot to her demand letter of a call from (800) 892-4357 around the time Tranche entered Johnson's data into Charter's computer system as a lead.  See Ex. A, demand letter, screenshot attachment from 12-26-19; Ex. B, SOM data, upper left corner and bottom left corner.  Despite the facially apparent falsity of Tranche's position, even in January of 2022 (months after

---

[7] Johnson authenticated these screenshots at Doc. No. 64-1.

Charter's lawyer concluded to the contrary), Charter was unwavering on two points:

(1) DeMya Johnson was the one who called the Charter number on December 26,

2019; and (2) Charter did an absolutely thorough investigation:

- "My understanding is that, based on our investigation, it was determined that the call was actually an inbound call made to the third-party vendor." Ex. C, N.T. Jones, p. 29:18-21;

- "We thoroughly investigated everything on our end." *Id.,* p. 48:11-12.

- "Our understanding is this call is an inbound call, not an outbound call."  N.T. Jones, p. 46:7-8;

- "based on everything I know, the call was an inbound call and not an outbound call." N.T. Jones, p. 49:3-5.

When asked for details about this supposedly thorough investigation, Charter's

designee testified:

- We asked [Tranche] to send us any instance of calls related to this number and the only thing that was returned was the inbound call from the plaintiff. Ex. C, N.T. Jones, p. 35:5-8.

After its supposed investigation, Charter sent an exculpatory statement to the

Connecticut and Alabama attorneys general- a statement Charter did not supplement

or update when it became apparent the prior response was untrue. *See* Exhibit G; *See*

Exhibit J, RFA Responses No. 6 and 15.

### C. Current Posture of the Case

While Tranche's counsel is withdrawing from the case (Doc. No. 128) the

Pakistan-based marketer's brief participation included its admission that the

December 26, 2019 recording was altered (which was obvious) and that Tranche placed at least two calls to DeMya Johnson.  Doc. No. 123.  The most perturbing fact confirmed from Tranche's participation was that Charter did **nothing** to assure that Tranche's phone records were preserved. Doc. No. 123, AD: 2.  In fact, Charter did not even tell Tranche of the lawsuit by DeMya Johnson until over a year and a half after she filed suit in Alabama Small claims court.  *Id.*

At the conclusion of this protracted litigation, Charter will likely argue once, that Johnson cannot "prove" the 31 calls which Tranche has not acknowledged making, were actually calls made on Charter's behalf or at least cast doubt and insist that is a jury question.[8]  In other words, Charter wants to be the beneficiary of its own failure to preserve records and its own systemic willful blindness.  Charter's conduct is a textbook illustration of a party's failure to preserve records, warranting the sanction of an adverse inference.

## IV.   LEGAL ARGUMENT

### A. Standard for a Spoliation Sanction

Spoliation is defined as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Austrum v. Federal Cleaning Contractors, Inc.*, 149 F. Supp. 3d 1343, 1346 (S.D. Fla. 2016), citing *Graff v. Baja Marine*, 310 Fed.

---

[8] *See* Charter's motion for summary judgment, Doc. No. 57, ¶¶ 47-51.

Appx. 298, 301 (11th Cir. 2009).  While a party must be in control of the documents it allegedly failed to preserve to be subject to an adverse inference for spoliation, "a party may control information or evidence it neither owns nor possesses when it has the legal right, authority, or practical ability to obtain the evidence." *Axis Ins. Co. v. Terry*, No. 2:16-cv-01021-JHE, 2018 U.S. Dist. LEXIS 230516, at *14 (N.D. Ala. Apr. 23, 2018)).  Where direct evidence of bad faith is not available, bad faith may be inferred where the responsible party knew or should have known of a duty to preserve the evidence. *Flury v. Daimler Chrysler Corp., 427 F.3d 939, 946 (11th Cir. 2005)*; *Waters v. AIG Claims, Inc.,* 608 F. Supp. 3d 1120, 1137 (M.D. Ala. 2022) ("[b]ad faith can be found based on direct evidence or circumstantial evidence where certain factors converge.")

### B. Plaintiff is entitled to an adverse inference against Charter

When considering whether to impose sanctions for spoliation including adverse inference, the court must consider "(1) whether the party seeking sanctions was prejudiced as a result of the destruction of evidence and whether any prejudice could be cured, (2) the practical importance of the evidence, (3) whether the spoliating party acted in bad faith, and (4) the potential for abuse if sanctions are not imposed." *Tesoriero v. Carnival Corp*., 965 F.3d 1170, 1184 (11th Cir. 2020); *Waters v. AIG Claims, Inc*., 608 F. Supp. 3d 1120, 1137 (M.D. Ala. 2022).  Below Johnson addresses the four factors set forth in *Tesoriero*:

### 1. Johnson has been prejudiced by Charter's failure to assure Tranche and its other resellers keep phone records.

When a party has knowledge of a pending or potential lawsuit and accepts responsibility for evidence that would be used in that lawsuit, it should be held liable for damage resulting from the loss or destruction of that evidence. *Smith v. Atkinson*, 771 So. 2d 429, 433 (Ala. 2000).  Here, in January and February of 2020, DeMya Johnson wrote a demand letter to Charter alleging TCPA violations and then filed suit in small claims court against Charter for unlawful calls to her number.  Exhibits A and A-1. Charter knew from its computer system that Tranche was the party with whom Johnson spoke and Johnson had even attached a screenshot of an incoming call,[9] to her demand letter showing a Charter number at the time of the conversation logged in Charter's records.  *See* Ex. A, screenshot from 12-26-19; *See* Ex. B.

Charter's position (expressed in the pre-motion discovery dispute conference letter), that Charter had no obligation to assure accurate record-keeping by Tranche, is at odds with the black letter law. While a party must be in control of the documents it allegedly failed to preserve to be subject to an adverse inference for spoliation, "a party may control information or evidence it neither owns nor possesses when it has the legal right, authority, or practical ability to obtain the evidence."  A*xis Ins. Co. v. Terry*, No. 2:16-cv-01021-JHE, 2018 U.S. Dist. LEXIS 230516, at *14 (N.D. Ala.

---

[9] Meaning incoming from Johnson's perspective.  It would be an outbound call from Tranche/Charter's perspective.

Apr. 23, 2018) (England, J.) (citing *Selectica, Inc. v. Novatus, Inc.*, No. 6:13-CV-1708-ORL-40, 2015 U.S. Dist. LEXIS 30460, 2015 WL 1125051, at *4 (M.D. Fla. Mar. 12, 2015). Charter has "audit rights" of its resellers and claims it restricts outbound telemarketing.[10]  If those items have meaning, it has the ability to obtain phone records from its resellers.

Further, a companion regulatory framework to the TCPA, the federal Telemarketing Sales Rule, 16 C.F.R. § 310 *et seq*. ("TSR") requires either a "telemarketer" (who directly places calls) and a "seller" (on whose behalf calls are made) to keep records for 24 months from the time of the marketing activity at issue. 16 C.F.R. §§ 310.5(a)-(d).  Further, Charter is no stranger to TCPA litigation. See e.g. *Maes v. Charter Commun*., 345 F. Supp. 3d 1064 (W.D. Wis. 2018); Mo. ex rel. *Koster v. Charter Communs*., Inc., No. 4:15-CV-1593 RLW, 2016 U.S. Dist. LEXIS 53347, (E.D. Mo. Apr. 21, 2016); *Nakai v. Charter Communs.,* Inc., No. CV 19-8035-GW-SSx, 2020 WL 1908949, 2020 U.S. Dist. LEXIS 70186 (C.D. Cal. Apr. 15, 2020); *Hogans v. Charter Communs., Inc*., 563 F. Supp. 3d 464 (E.D.N.C. 2021); *Pavelka v. Charter Communs., Inc*., No. 3:20-cv-01557 (MPS), 2021 U.S. Dist. LEXIS 227756, 2021 WL 5566390 (D. Conn. Nov. 29, 2021); *Leeb v. Charter Communs., Inc*., No. 4:17CV2780 RLW, 2019 U.S. Dist. LEXIS 4590, 2019 WL 144132 (E.D. Mo. Jan. 9, 2019).   Charter also operates in an industry -

---

[10] Ex. D, § 17 and 3.1.1.

telecommunications, cable and internet- where TCPA violations have been widespread and pervasive. See *Krakauer v. Dish Network, L.L.C*., 925 F.3d 643 (4th Cir. 2019); *See In re DISH Network, LLC*, 28 FCC Rcd 6574, 6574 (F.C.C. May 9, 2013). Accordingly, even before the litigation hold went into effect, Charter had reason to assure its marketing vendors retained phone records.

Broadly speaking, courts have routinely rejected efforts by TCPA defendants to avoid liability or reduce exposure due to the absence of phone records, and instead have drawn inferences against such defendants. See *Valle v. Glob. Exch. Vacation Club*, 320 F.R.D. 50, 61 (C.D. Cal. 2017) ("Class certification cannot be defeated by Defendants' poor record-keeping or failure to establish performance data reporting mechanisms with their third-party vendors. This would incentivize companies to not keep records, or not require that their vendors keep records, in an attempt to circumvent TCPA liability").

In *Krakauer v. Dish Network L.L.C.,* No. 1:14-CV-333, 2017 U.S. Dist. LEXIS 77163, (M.D.N.C. May 22, 2017), Charter's fellow telecom giant, Dish Network, unsuccessfully attempted a similar approach as Charter attempts here, relating to Dish's recordkeeping and its relationship with its telemarketing vendor, Satellite Systems Network ("SSN"). Pertinent to this motion, the Middle District of North Carolina emphatically rejected Dish's efforts to evade responsibility for its agent's failure to keep complete and accurate records:

> contrary to Dish's assertions, these violations are relevant because the earlier violations established the framework for the relationship between Dish and SSN in the years to come: **Dish would turn a blind eye to any recordkeeping lapses and telemarketing violations by SSN**; any lawsuits brought against SSN were SSN's problem, not Dish's; and Dish would not modify or terminate its contract with SSN as a result of TCPA violations, recordkeeping breaches, lawsuits, or complaints.

*Krakauer*, at *30 (emphasis added).  Much like Dish Network in *Krakauer*, Charter did all it could to avoid any meaningful investigation into the obvious TCPA violations of Tranche and declined to assure Tranche preserved records.

The TCPA case *Perrong v. Sperian Energy Corp.*, No. 2:19-cv-00115-RFB-EJY, 2020 U.S. Dist. LEXIS 199664, 2020 WL 6287723 (D. Nev. Oct. 27, 2020) is instructive and directly on point.   In *Perrong,* the District of Nevada imposed sanctions, including adverse inference, against a TCPA defendant for failing to retain and preserve phone records of its independent call center vendors, after being on notice of the TCPA litigation.  The court found the defendant had the ability to assure its telemarketing vendors maintained records yet brazenly declined to do so:

> Here, there is no doubt that EGC had the practical ability to obtain the documents from Team Integrity. In fact, EGC boasts that it did obtain documents from Team Integrity without a subpoena. … even if EGC did not have practical control over records held by Team Integrity, it had an obligation to ensure its strategic partner preserved records and to ensure the prompt disclosure of the location of calling record at issue in this dispute.

*Perrong*, at 25.

The facts present in *Perrong* closely mirror those here.  Charter has the ability to audit and demand records from Tranche. Ex. D, § 17.  Despite that, much like ECG to its marketing partners in *Perrong,* Charter "did nothing to obtain calling records."  *Perrong*, at 25.  Further, Charter was happy to take ownership of Tranche's supposed "records" when Charter thought the records could be construed as exculpatory.  Specifically, Charter referenced records when writing the Alabama and Connecticut attorneys general office.  *See* Exhibits G and J (RFA Responses 6 and 15).  Charter also presented the doctored recording from Tranche and wrote to counsel advising of the call's supposed exculpatory features, when it believed the call could be construed as Johnson calling the Charter number.  *See* Ex. H.

Instead of keeping records of telemarketing activities, advising its reseller of a litigation hold or exercising audit rights as permitted by the Reseller Agreement,[11] Charter did not even advise Tranche of the lawsuit until a year and a half after Johnson filed the small claims action.  *See* Doc. No. 123, AD: 2.  Instead of compliance and transparency, Charter exhibited willful blindness and opacity.

### 2.  Tranche's phone records could be crucial to Plaintiff's case.

Right now, Plaintiff has her screenshots, recordings, her phone records and her testimony for 33 unlawful calls.  Tranche, however, has only confirmed it made

---

[11] *See* Ex. D, § 17.

two of those calls and claims to be without sufficient evidence to admit or deny the rest.  Doc. No. 123, para 35-43.  Charter claims it lacks any records of calls made by Tranche.  Plaintiff can still ask the jury to conclude, by a preponderance of the evidence, that the remaining 31 calls were dialed by Tranche on behalf of Charter. Nonetheless, because of Charter's spoliation, what would be a stipulation of fact as to the remaining 31 calls, is now a jury question.   Accordingly, Johnson was prejudiced by Charter's spoliation.

### 3. Charter's conduct as it relates to recordkeeping and Tranche and its aversion to transparency demonstrates irrefutable bad-faith.

Even if a litigation hold is violated and documents are not preserved, a party may only obtain the sanction of an adverse inference against the spoliating party in the event the spoliation was done in bad faith.  *Oil Equip. Co. Inc. v. Modern Welding Co. Inc.*, 661 F. App'x 646, 658 (11th Cir. 2016).  For the "bad faith" factor in the spoliation analysis, it is not necessary to show the spoliator acted with malice under the bad faith/culpability factor in the Eleventh Circuit. *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 946 (11th Cir. 2005); *Oil Equip. Co.* 661 F. App'x 646, 658 ("'malice, which, while clearly sufficient, is not necessary to support a finding of bad faith in this Circuit."); *Silver v. Countrywide Home Loans, Inc.*, 483 F. App'x 568, 572 (11th Cir. 2012). But there must be more than mere negligence. *E.g., Penick v. Harbor Freight Tools, USA, Inc.*, 481 F. Supp. 3d 1286,

1293 (S.D. Fla. 2020) (collecting cases); *Long v. Celebrity Cruises, Inc.*, 12-22807-CIV, 2013 U.S. Dist. LEXIS 202770, 2013 WL 12092088, at *7-8 (S.D. Fla. July 31, 2013) (ordering spoliation sanctions based upon reckless conduct). Instead, "[b]ad faith can be found when a party fails to preserve evidence that it knew or should have known was relevant to litigation." *Waters v. AIG Claims, Inc.*, 608 F. Supp. 3d 1120, 1137-38 (M.D. Ala. 2022)

The term "bad faith" is often thrown around liberally between parties in litigation. However, Charter's conduct as it relates to Tranche, the "records" presented by Tranche, and its jaw-dropping actions to evade scrutiny, paint a picture supremely worthy of the term.

On a macro-level, Charter was well aware it could be liable for the unlawful calls of its agents.[12]   However, instead of assuring violations did not occur, it established a system where it always would have plausible deniability as a result of its failure to require resellers keep phone records. Charter also benefits the shield it creates by "prohibiting" outbound calls. Specifically, Charter can just argue it's not necessary to monitor phones of its resellers, because resellers are "prohibited" from making outbound calls.

The fact neither Tranche nor Charter have Tranche's phone records from the relevant time-period is not a fluke or an unfortunate characteristic of Plaintiff's case

---

[12] See *supra,* collection of a small percentage of TCPA suits against Charter.

going into trial.  Rather, it is the result of Charter's decision to create incentives for its marketing vendors to telemarket Spectrum services, without creating any disincentives meaningful disincentives for their resellers from doing so unlawfully. <u>See</u> *Krakauer,* at 30 ("Dish would turn a blind eye to any recordkeeping lapses and telemarketing violations by SSN…and Dish would not modify or terminate its contract with SSN as a result of TCPA violations, recordkeeping breaches, lawsuits, or complaints.")

More specific to the facts of this case, Charter's conduct specific to this litigation, also reflects bad faith.  Some examples of Charter's reckless disregard of its duty to preserve records and strategic efforts to avoid disclosure of the underlying facts of the case are outlined below:

    a. Charter had contractually afforded "audit rights"[13] of Tranche, yet failed to ask Tranche to turn over any phone records.  Even when Tranche turned over a "recording" that conflicted with DeMya Johnson's screenshot (and later phone records), Charter did not ask Tranche to turn over its phone records or other recordings,[14] nor did Charter seek those records from third-party carriers;

    b. Charter did not send a preservation letter or even advise Tranche of DeMya Johnson's lawsuits (in small claims, or federal court) until Charter decided it wanted indemnification a year and a half after the small claims suit was filed;[15]

---

[13] Ex. D, § 17.

[14] Doc. No. 123, AD: 2.

[15] Ex.  K, 8-4-21 letter to Tranche.

    c.   Despite Charter's own lawyer concluded the December 26, 2019 call to Johnson was initiated by Tranche, Charter's corporate representative insisted Charter did a "thorough investigation" and "it was an inbound call";[16] and

    d.   Charter relied on a falsified record from Tranche when attempting to exculpate itself to civil authorities of the Alabama and Connecticut attorneys general. Charter then failed to update those representations when being presented with evidence that Charter's representations were false.[17]

Charter's decision not to require its resellers keep phone records and the willful blindness exhibited, are part of a bad faith approach to TCPA compliance. That bad faith approach was on display in the course of this litigation.

### 4. There is potential for future abuse by Charter if sanctions are not imposed.

Charter's actions outlined above reflect that the willful blindness to TCPA violations is not a bug, but a feature, of Charter's approach to marketing and consumer privacy laws. Charter incentivizes its resellers to sign up as many Spectrum cable subscribers as it possibly can.[18] Charter ostensibly tells its resellers not to make outbound calls, but by failing to require record keeping or monitoring,

---

[16] "My understanding is that, based on our investigation, it was determined that the call was actually an inbound call made to the third-party vendor." Ex. C, p. 29:18-21.

[17] Ex. G, letters to attorneys general. *See* Ex. J, Charter responses to requests for admission, numbers 5 and 16 ("admit that the letter was not amended or supplemented, as there was nothing to amend or supplement. The contents of the letter remain true.")

[18] Ex. C, N.T. Jones, p. 110:12-21.

practically impossible to ascertain when outbound calls are made.[19]  If Charter does not monitor phones or review phone records of its resellers, then the "prohibition" it claims to place on reseller telemarketing, is meaningless and self-serving.

In other words, Charter enforces its purported restriction on reseller telemarketing on the honor system- with a wink and a nod to its marketing vendors. If the system Charter has in place continues unabated, Charter could always have plausible deniability for any violation of one of its resellers.  If a customer complains about unwanted Spectrum calls, Charter can just say the calls must have been "spoofed" by shadowy third-parties, and even if it were a Charter vendor making calls for Charter, it's only the vendor's problem because such calls are "prohibited."

It took a remarkable effort just to confirm that Charter's reseller actually made any calls for Charter.  First, it required DeMya Johnson going "undercover" and engaging with the calling party to make it into Charter's computer system.  Then it took a degree of persistence in litigation unusual in a single-plaintiff TCPA case. Finally, in the fourth calendar year of this litigation, Tranche retained counsel and admitted to falsifying the recording in its Answer. Doc. No. 123, AD 8.  Even after all of that, Charter will still deny responsibility for any calls and claim that only two of them have been confirmed.  Where unwanted robocalls caused five million

---

[19] Most people do not hire counsel and go through years of litigation over unlawful telemarketing calls.  Accordingly, that the calls were able to be proven by DeMya Johnson here, is a highly anomalous situation.

Americans to complain to the FTC in 2021,[20] Charter's failure to keep records of its vendors is inexcusable. Consumers should not have to scale Mr. Everest to demonstrate who is behind the calls. A decision not to impose sanctions against Charter, would assure the continuation of business as usual.

### 5. Specific adverse inference sought by DeMya Johnson

Plaintiff seeks the following adverse inference against Charter:

On any instance where DeMya Johnson demonstrates she received an incoming call from a number attributable to Charter and/or a call where the calling party references "Spectrum" or otherwise attempts to sell "Spectrum" services, but Tranche and/or Charter have not produced record(s) of such call, the Court can infer in any dispositive motion or post-trial motion that the records would be unfavorable to Charter.  Likewise, at trial, in any instance where DeMya Johnson demonstrates she received an incoming call from a number attributable to Charter and/or a call where the calling party references "Spectrum" or otherwise attempts to sell "Spectrum" services, but Tranche and/or Charter have not produced record(s) of such call, the jury will be instructed that it can infer or presume the records would be unfavorable to Charter.

That proposed adverse inference is included in Plaintiff's Proposed Order.

---

[20] Federal Trade Commission: FTC Issues Biennial Report to Congress on the National Do Not Call Registry (Jan. 5, 2022), available at: https://www.ftc.gov/news-events/news/press-releases/2022/01/ftc-issues-biennial-report-congress-national-do-not-call-registry.

**C. Plaintiff is entitled to reasonable attorneys' fees for the filing of this motion only.**

Charter's failure to assure Tranche maintained or preserved phone records is the reason why this case has been litigated so extensively.  Plaintiff could, perhaps, seek fees for all actions taken since the first motion to extend discovery.  However, Plaintiff does not wish to turn this dispute into a quarrel about attorneys' fees.  Accordingly, Plaintiff seeks fees associated with the drafting and filing of this motion only.  If the Court finds that relief to be appropriate, Plaintiff proposes submitting a bill within seven (7) days of the Order.

## V.   CONCLUSION

For the foregoing reasons, Plaintiff DeMya Johnson seeks an adverse inference against Charter Communications consistent with the language included in the attached Proposed Order, as well as attorneys' fees in connection with the drafting and filing of this Motion.

Respectfully submitted,

/s/ *Jacob U.  Ginsburg*
Jacob U. Ginsburg, Esq. (*pro hac vice*)
Kimmel & Silverman, P.C.
30 East Butler Ave.
Ambler, PA 19002
Phone: (267) 468-5374
Facsimile: 877-788-2864
Email: jginsburg@creditlaw.com
teamkimmel@creditlaw.com

Dated: April 28, 2023

## CERTIFICATE OF SERVICE

I, Jacob U. Ginsburg, Esq. hereby certify that I served a true and correct copy of the foregoing on all parties of record via ECF on April 27, 2023.

*/s/ Jacob U. Ginsburg*