# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| DEMYA JOHNSON, | Case No. 5:20-cv-02056-LCB |
|      Plaintiff, | Hon. Liles C. Burke |
| v. | |
| CHARTER COMMUNICATIONS, INC., AND TRANCHE TECHNOLOGIES, INC., | Second Am. Complaint Filed: Sept. 21, 2022 |
|      Defendants. | |

## DEFENDANT CHARTER COMMUNICATIONS, INC.'S BRIEF IN SUPPORT OF ITS RENEWED MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................1

II.    STATEMENT OF UNDISPUTED MATERIAL FACTS.............................3

    A.  Plaintiff Received 33 Telemarketing Calls, Two from Tranche's Subordinates and the Remainer from Unidentified Third Parties. ..........3

    B.  Charter Has Robust TCPA Compliance Practices...................................4

    C.  Tranche Was Not Authorized to Make Outbound Telemarketing Calls on Charter's Behalf......................................................................7

    D.  Tranche Was Only Authorized to Market Via Inbound Pay-Per-Click Advertising. ...........................................................................8

    E.  Tranche Lied and Fabricated Evidence to Hide Its Outbound Calls from Charter. ................................................................................9

    F.  Tranche Doubled Down on Its Lies to Avoid Being Terminated, Even After Charter Confronted It with Plaintiff's Phone Records.................12

    G.  In Its Answer, Tranche Admitted for the First Time That, Contrary to What It Told Charter, Its "Subordinates" Called Plaintiff Twice and Altered the Recording to Hide the Calls from Charter...........................13

    H.  Tranche's Subordinates and the Other Unknown Callers Called Plaintiff Without Charter's Knowledge or Authorization. ...................................15

III.   LEGAL STANDARD..................................................................18

IV.    ARGUMENT AND CITATION OF AUTHORITIES .................................19

    A.  Plaintiff Cannot Demonstrate Any Theory of Agency Between Charter and the Callers, Precluding Vicarious Liability.....................................19

        1.  Charter Did Not Control the Manner and Methods of Tranche's Work, Foreclosing Actual Agency..............................................20

2.   Tranche's Rogue Subordinates Acted Far Outside of Any Purported Actual Agency Relationship When They Called Plaintiff, Further Precluding Actual Agency. ...............................................................23

3.   Charter Made No Representations to Plaintiff as to Tranche's Authority to Make Outbound Telemarketing Calls, Foreclosing Apparent Authority. ...........................................................................24

4.   Charter Neither Knew About nor Benefited from the Calls, Foreclosing Ratification. ..................................................................25

B.   Plaintiff Cannot Establish the Calls Were Made Using an ATDS or PRV..............................................................................................26

C.   Plaintiff's DNC Claim Fails Because She Cannot Establish that the Calls Were Made on Charter's Behalf. ................................................27

D.   Plaintiff's Request for Injunctive Relief Fails as a Matter of Law.........29

IV.   CONCLUSION ...............................................................................30

## I.    INTRODUCTION

DeMya Johnson seeks to hold Charter Communications, Inc. vicariously liable under the Telephone Consumer Protection Act ("TCPA") for 33 calls allegedly made by Defendant Tranche Technologies, Inc.'s subordinates and/or other unidentified third parties. But Plaintiff does not even know who made 31 of the calls—many of which either don't mention Charter at all or mention one of its direct competitors, AT&T—and thus cannot legally attribute them to Charter under any theory of agency, whether actual agency, apparent authority, or ratification.

Nor can she prove that Charter authorized or ratified the two calls that Tranche, an independent contractor that did *inbound* sales for Charter and other companies, now says its subordinates in Pakistan made. That is because the undisputed evidence shows that Charter contractually *forbade* Tranche from outbound telemarketing, which is handled strictly by Charter's separate telemarketing group. In fact, Tranche's subordinates in Pakistan went so far as to fabricate evidence to hide the outbound calls from Charter, so Charter would not terminate Tranche (which Charter did anyway). Charter neither knew about, authorized, nor benefitted from any outbound calls by Tranche. Indeed, Charter didn't discover that Tranche made any outbound calls until after this lawsuit was filed, despite auditing Tranche throughout the relationship to ensure Tranche's compliance with the contract—which Charter was not legally required to do. And

Charter never made *any* representation to Plaintiff about Tranche, whether about Tranche's authority to make such calls or otherwise.  These facts are dispositive and alone require summary judgment in favor of Charter.

But Plaintiff's claims also fail for other independent reasons.  First, Plaintiff's claim based on use of an automatic telephone dialing system ("ATDS") fails because Plaintiff has no evidence any alleged calls were made using an ATDS.  Second, her pre-recorded voice ("PRV") claim fails as to 13 calls that played no PRVs.  Third, Plaintiff's National Do-Not-Call Registry ("National DNC Registry") claim fails for the same reasons she cannot prove vicarious liability: she hasn't proven that any of the calls were made on Charter's behalf, much less two calls in a twelve-month period, which is a prerequisite to a DNC claim.  This claim also independently fails as to five of the calls that were made before Plaintiff registered her number.  Accordingly, even assuming Plaintiff could attribute any of the calls at issue to Charter on a vicarious liability theory, which she cannot, Charter would be entitled to summary judgment on Plaintiff's ATDS and DNC claims altogether and on her PRV claim as to 13 calls.

Fourth, Plaintiff's request for injunctive relief is improper.  She has an adequate remedy at law—statutory damages under 47 U.S.C. § 227(b)(3)—precluding the availability of injunctive relief.

Because there is no genuine issue of material fact as to any of these issues, Charter is entitled to summary judgment as a matter of law.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.    Plaintiff Received 33 Telemarketing Calls, Two from Tranche's Subordinates, and the Remainer from Unidentified Third Parties.**

1.    At all relevant times, Plaintiff was assigned the cellular telephone number (256) 318-8330 (the "8330 Number").  Howd Decl., Ex. B ("Johnson Dep., vol. I") at 43:14–21. Plaintiff allegedly registered the 8330 Number with the National DNC Registry on December 16, 2019.  *Id.* at 110:2–14; Howd Decl., Ex. D at Answer No. 4.

2.    In this lawsuit, Plaintiff sues Charter and Tranche under the TCPA for 33 calls to the 8330 Number that were allegedly made using an ATDS and/or PRV from November 21, 2019 through August 7, 2021 without her consent and despite her number being registered on the National DNC Registry.  *See id.* at 113:5, 114:1–11, 127:18–128:6; ECF 93 ("SAC") ¶¶ 31, 32, 43, 46.

3.    Specifically, Plaintiff alleges that Tranche and unidentified third parties are directly liable as the entities that called her and that Charter is vicariously liable for the calls purportedly made on its behalf.  SAC ¶¶ 80 n.6, 90 n.7.

4.    Plaintiff's SAC also alleges claims for negligence and negligent hiring, training, and supervision against Charter; spoliation of evidence against both Defendants; and fraud against Tranche.  *Id.* ¶¶ 78-131.  However, on July 26, 2023,

the Court granted Charter's partial motion to dismiss, which dismissed all tort claims against Charter. ECF 167. As a result, the only claims that remain are: (1) the 227(b) TCPA claim against both Defendants for calls using an ATDS and/or PRV; (2) the 227(c) TCPA claim against both Defendants for telemarketing calls made to Plaintiff's number while it was registered on the National DNC Registry; and (3) the fraud claim against Tranche.

5.      Plaintiff does not know what dialing system was used to make the calls. Howd Decl., Ex. C ("Johnson Dep., vol. II") at 63:9–64:9. Plaintiff admits that none of the eight missed calls resulted in voicemails, so no PRVs could've played. Johnson Dep., vol. I at 118:13-15. She further admits that the November 3, 2020 call did not play a PRV (*id.* at 139:12-142:7, Ex. 5 at 7), and she provided no evidence that any PRVs played on the following four calls: November 4, 2020; November 10, 2020; and the two calls on November 27, 2020 (*id.*, Ex. 5 at 7-9). Five of the calls occurred *before* Plaintiff registered her number with the National DNC Registry. SAC ¶ 32; Howd Decl. ¶ 6 (first five calls allegedly received from November 21 through December 5, 2019), Ex. D at Answer No. 4 (number registered on December 16, 2019).

**B.    Charter Has Robust TCPA Compliance Practices.**

6.      Charter is a national provider of cable television, high speed internet, and telephone services. ECF 57-1 ("Jones Decl.") ¶ 5. Charter provides residential

services under the brand name "Spectrum."  *Id.*

7.    Charter markets its services through a variety of tactics, including direct mail, in-person selling at trade shows, door-to-door sales, internet marketing, and outbound telemarketing.  *Id.* at 6.

8.    Charter spends substantial sums ensuring its telemarketing operations comply with all laws.  *Id.* at 7.  As part of these compliance measures, Charter engages in outbound telemarketing exclusively through one internal group, Telesales, also called "OTM" or "outbound telemarketing."  *Id.*; Howd Decl., Ex. A ("Jones Dep.") at 35:4–14.

9.    Telesales makes marketing calls and engages certain authorized, professional third-party vendors ("Telemarketing Vendors") with robust compliance practices to do so.  Jones Decl. ¶ 8.  The Telemarketing Vendors are subject to rigorous restrictions, including: only calling numbers with certain types of dialing equipment, only calling numbers provided by Charter on a pre-scrubbed lead list; re-scrubbing each lead list for numbers on the National DNC Registry and Charter's internal do-not-call list; strictly honoring and reporting to Charter any internal do-not-call requests; and keeping records of each call initiated on Charter's behalf.  *Id.* Charter has intentionally cordoned off its telemarketing channel and prohibited all other marketing channels from telemarketing, so experts in the outbound telemarketing group can ensure compliance in that heavily regulated area.  *Id.*

10. To further ensure compliance, Charter only pays Telemarketing Vendors for sales made to phone numbers provided by Charter on a lead list. *Id.* ¶ 9; Jones Dep. 35:4–14, 48:22–49:2, 60:6–10. In other words, Telemarketing Vendors would receive no compensation for calls made to numbers not appearing on the pre-scrubbed Charter lead list provided to the Telemarketing Vendors for the period in which the sale was made. Jones Decl. ¶ 9. This removes any incentive to make unauthorized calls and is thus a significant additional compliance safeguard that goes above and beyond what is required by law. *Id.*

11. In the course of its regularly conducted business, Charter creates and electronically maintains records of all outbound telemarketing calls it makes, all inbound calls it receives, all do-not-call requests it receives, all pre-scrubbed telephone numbers it provides to its Telemarketing Vendors on leads lists, and all orders for Charter services (whether completed or abandoned). *Id.* ¶ 10.

12. Separate and apart from the Telemarketing Vendors, Charter contracts with dozens of independent third-party Resellers ("Resellers") to market and sell Charter services via inbound methods only, such as internet marketing campaigns that display a phone number a consumer can call. *Id.* ¶ 11. Resellers are strictly and contractually prohibited from directly or indirectly soliciting subscriptions for Charter services via outbound telemarketing, and they are also prohibited from violating any applicable laws, ordinances, rules, and regulations. *Id.*

13.    These Resellers are not exclusive to Charter and often sell many companies' competing services.  *Id.* ¶ 19.

## C.    Tranche Was Not Authorized to Make Outbound Telemarketing Calls on Charter's Behalf.

14.    Tranche was one of these Resellers from July 2019 to August 2021.  *Id.*

15.    Tranche entered into a Reseller Marketing Agreement with Charter, effective July 29, 2019 (the "Marketing Agreement").  *Id.* ¶ 24, Ex. C § 3.1.1.  The Marketing Agreement expressly forbids outbound telemarketing: "Reseller is prohibited, directly or indirectly, from soliciting subscriptions for Charter Services via . . . ***outbound telemarketing, either live or recorded***."  *Id.*, Ex. C § 3.1.1 (emphasis added).  The Marketing Agreement also required Tranche to comply with all applicable laws, ordinances, rules, and regulations.  *Id.*, Ex. C § 12.2.3.

16.    On or about August 8, 2019, Tranche signed the Charter Communications Marketing Rules ("Marketing Rules").  *Id.* ¶ 25, Ex. D.  The Marketing Rules expressly reiterate the total ban on outbound telemarketing: "The following sales tactics are prohibited: . . . Soliciting subscriptions for Charter Services, directly or indirectly, via . . . text messaging ***or outbound telemarketing, either live or recorded is prohibited***."  *Id.*, Ex. D at 1 (emphasis added).

17.    Charter has a "zero tolerance" policy on outbound telemarketing: if it confirms a Reseller has violated its contractual prohibition on outbound telemarketing, the Reseller will be immediately terminated.  Jones Dep. 69:13–16;

7

Jones Decl. ¶ 26.

## D. Tranche Was Only Authorized to Market Via Inbound Pay-Per-Click Advertising.

18.    Tranche was authorized only to market via pay-per-click advertising. ECF 154-1 ("Saleh Decl.") ¶ 6.  For example, someone searching for "cheap cable deals in my area" would see one of Tranche's ads on Google, click on it, and be directed to one of Tranche's two authorized websites: https://cable-tv.live/ and https://home-cable.me/, which listed phone numbers for consumers to call Tranche. *Id.*; Jones Decl. ¶ 27.    Consistent with Charter's prohibition on outbound telemarketing, neither of these websites had any sort of form through which a consumer could provide information to be called by Tranche.   Jones Decl. ¶ 27. Tranche was never approved for any other marketing tactics.  *Id.*

19.    The Marketing Agreement provides that Tranche is an independent contractor.   *Id.*  ¶ 24, Ex. C § 18.12.   Tranche controlled its own day-to-day operations, including any call center that was used in any aspect of its business.  *Id.* ¶ 28; Jones Dep. 51:1–4.  Charter did not provide Tranche with any office space, telephone equipment, or other equipment for Tranche to engage in its work.  Jones Decl. ¶ 28.  Charter did not control the days or hours of Tranche's operations or supervise Tranche's activities on a day-to-day basis.  *Id.*  Tranche hired its own staff, and Charter could not hire or fire any of those individuals.  *Id.*  Charter paid Tranche on a commission basis.  *Id.*

20.     Charter did not have any access to Tranche's records.  *Id.*, Ex. C § 17. Tranche only possessed access to a one-way external portal maintained by Charter that could be used to submit potential customers to Charter.  *Id.* ¶ 29.  Tranche did not have access to Charter's subscriber records, billing systems, or other back-end systems.  *Id.*  Nor did it have access to Charter's consumer information or marketing database of potential customers.  *Id.*

21.     Tranche did not market exclusively on behalf of Charter; it could (and it is Charter's understanding that it did) attempt to facilitate sales for other industry participants or clients at the same time it was digitally marketing for Charter.  *Id.* ¶ 30.

22.     Plaintiff has no knowledge as to the relationship or obligations between Charter and Tranche.  Johnson Dep., vol. I at 164:1–23.

**E.    Tranche Lied and Fabricated Evidence to Hide Its Outbound Calls from Charter.**

23.     Charter added the 8330 Number to its internal do-not-call list on January 9, 2020, after receiving notice of Plaintiff's claims via Plaintiff's demand letter dated January 8, 2021.  Jones Decl. ¶ 13; Johnson Dep., vol. I at 66:2–7.

24.     Charter conducted an exhaustive and expensive investigation into Plaintiff's claims (including casting a wide net to determine not only if the 8330 Number was called, but also if it appears anywhere in Charter's systems, for any reason, including, for instance, billing, collections, etc.).  Jones Decl. ¶ 14.  This

exhaustive investigation confirmed that Charter has no records of it or any Telemarketing Vendor ever calling the 8330 Number (including records of any dialing history or any call logs), or otherwise contacting the 8330 Number, and such records would exist in Charter's possession if Charter had made or authorized the calls. *Id.*; Jones Dep. 35:4–14, 48:11–21, 60:5–10. Plaintiff concedes that Charter did not itself make the calls at issue. SAC ¶ 80, n.6.

25. During Charter's investigation into Plaintiff's claims, it located an entry in its Sales Order Manager system ("SOM") showing that, on or around December 26, 2019, Plaintiff attempted to place an order for Charter services through Tranche. Jones Decl. ¶ 20, Ex. A; Jones Dep. 29:18–30:3.

26. Plaintiff never completed her order with Tranche. Jones Decl. ¶ 23. Charter never received any payment from Plaintiff, and Plaintiff did not become a subscriber of Charter's services. *Id.* Charter did not receive any benefit from any of the calls. *Id.* ¶ 23; Johnson Dep., vol. II at 114:8–14.

27. While Resellers are not authorized to make outbound telemarketing calls on behalf of Charter, out of an abundance of caution, Charter reached out to Saqib Raza, Tranche's owner, to inquire. Saleh Decl. ¶ 7.

28. On or around January 30, 2020, Charter spoke with Mr. Raza by telephone. *Id.* ¶ 8. He stated that Plaintiff called Tranche in response to one of its internet ads because she was unhappy with her current AT&T services. *Id.* He

insisted that Tranche did not make any outbound calls to Plaintiff. *Id.* When pressed about the displayed caller ID number that Plaintiff had provided (800-892-2253), he denied that anyone from Tranche ever used that telephone number. *Id.* Mr. Raza explained that Tranche had entered an order in Charter's SOM for Plaintiff, but the order was cancelled due to a prepayment issue. *Id.*

29. During this call, Charter requested that Mr. Raza provide call data and any call recordings Tranche had in its possession. *Id.* ¶ 9. He produced a single call recording for the December 26, 2019 call, which appeared to corroborate Mr. Raza's version of events. *Id.*; Jones Decl. ¶¶ 21-22, Ex. B.

30. In the recording, it sounds like Plaintiff called Tranche in response to an internet ad. Saleh Decl. ¶ 10; Jones Decl. ¶ 22, Ex. B. Plaintiff states that her current cable was "terrible," and she was looking for alternative options. Saleh Decl. ¶ 10; Jones Decl. ¶ 22, Ex. B. Nothing in the recording suggested that Tranche altered it in any way or that Tranche initiated the call. Saleh Decl. ¶ 10; Jones Decl. ¶ 22, Ex. B.

31. Tranche also adamantly contended to Charter that: (i) it does not make any outbound telemarketing calls; (ii) it did not make any outbound telemarketing calls to the 8330 Number; (iii) the display number for the call at issue, 800-892-2253, was not affiliated with Tranche; (iv) the December 26, 2019 call was an inbound call from Plaintiff, as shown by the recording; and (v) the inbound call was

generated from an advertisement on one of Tranche's approved websites.   Jones Decl. ¶ 22.

**F.    Tranche Doubled Down on Its Lies to Avoid Being Terminated, Even After Charter Confronted It with Plaintiff's Phone Records.**

32.    Charter's retail team managed the relationship between Charter and Tranche.  *Id.* ¶ 31.  The retail team conducted weekly quality control calls with its Resellers, including Tranche.  *Id.*; Saleh Decl. ¶ 15.  During these weekly calls, Charter shared marketing trends, discussed new products and Tranche's performance, and provided reminders of the Marketing Rules, per standard protocol. Saleh Decl. ¶ 15.  Additionally, Charter sent out newsletters to its Resellers with this information.  *Id.*; Jones Decl. ¶ 31, Ex. E.  Charter also performed audits on Tranche, including listening to random call recordings, per standard protocol, which did not reveal wrongdoing (only that Tranche was receiving inbound calls, as permitted). Saleh Decl. ¶ 16; Jones Decl. ¶ 31.

33.    The only complaint of an outbound telemarketing call by Tranche that Charter is aware of is Plaintiff's allegation in this case.  Saleh Decl. ¶ 14; Jones Decl. ¶ 32.

34.    On or around June 9, 2021, Charter received Plaintiff's AT&T records, which indicated the December 26, 2019, call was an outbound call from Tranche to Plaintiff.  Saleh Decl. ¶ 10.  Until it received the AT&T records, Charter never discovered any further indication that Tranche was violating the Marketing Rules by

engaging in outbound telemarketing.  *Id.*

35.    Just eight days later, on or around June 17, 2021, Charter reached back out to Mr. Raza by telephone to get an explanation.  *Id.* ¶ 11.  As before, he insisted the December 26, 2019, call was an inbound call.  *Id.*  He vehemently denied that Tranche had called Plaintiff, even when faced with the AT&T records.  *Id.*

36.    In August 2021, Charter terminated Tranche because, during its investigation into the possible alteration of the recording, Charter learned Tranche violated the Agreement by using Spectrum-branded terms in its advertising.  *Id.* ¶ 12.

37.    This allowed Charter to proceed with terminating Tranche while it was still investigating the suspected alteration of the call recording.  *Id.*  Even though this was the only complaint of alleged outbound calls by Tranche, Charter would have terminated Tranche regardless due to the suspected alteration of the call recording, given that Charter takes that restriction very seriously.  *Id.*

**G.    In Its Answer, Tranche Admitted for the First Time That, Contrary to What It Told Charter, Its "Subordinates" Called Plaintiff Twice and Altered the Recording to Hide the Calls from Charter.**

38.    Plaintiff waited until nearly one year after Charter identified Tranche to attempt to serve Tranche with a subpoena.  ECF 46; ECF 47.  Her first attempt to serve a subpoena on Tranche occurred on January 10, 2022—17 days before the close of the extended discovery period.  ECF 46; ECF 47.

39.    Plaintiff then moved to add Tranche as a defendant on January 24, 2022, and filed her SAC against Charter and Tranche on September 21, 2022.  ECF 35; ECF 93.

40.    Tranche failed to answer, and after the clerk defaulted Tranche, Tranche's counsel entered an appearance and moved to set aside the default, which the Court granted.  ECF 118; ECF 120.

41.    In its answer on January 25, 2023, Tranche admitted for the first time that, contrary to what it had repeatedly told Charter, Tranche "subordinates" had made two phone calls to Plaintiff in December 2019 (ECF 122 ¶ 83; ECF 123 ¶ 83) and altered the beginning of the December 26, 2019, call recording to make it appear to have been an inbound call to Tranche (ECF 123 at 16).

42.    Tranche, however, did not admit that it, a U.S. Company, had engaged in this conduct.  *Id.*  Rather, Tranche blamed its "[s]ubordinates in Pakistan" for making the calls and altering the recording, claiming "they were concerned about losing their jobs as a result of making outbound sales calls (prohibited by the Charter Communications Reseller Agreement)."  *Id.*

43.    Tranche also claimed that its "senior management" did not know about the altered recording "until months after [it] was sent to Charter."  *Id.*

44.    But even when Mr. Raza learned of the altered recording, he failed to inform Charter.  *See* Jones Decl. ¶ 12; ECF 154-2 ¶¶ 6-7.

**H.    Tranche's Subordinates and the Other Unknown Callers Called Plaintiff Without Charter's Knowledge or Authorization.**

45.    Charter did not authorize Tranche or anyone else to call the 8330 Number on Charter's behalf, nor did it provide the 8330 Number to any Telemarketing Vendor on a lead list.  Jones Decl. ¶ 14; Jones Dep. 35:4–14, 48:9–49:2.

46.    In fact, Charter never authorized Tranche to engage in outbound telemarketing and, prior to this lawsuit, was not aware of any occasions on which it was even alleged to have engaged in such practices.  Jones Decl. ¶ 14; Saleh Decl. ¶ 14.

47.    Charter never made any representation to Plaintiff about Tranche. Johnson Dep., vol. II at 113:18–114:7.  Plaintiff has no evidence *Charter* cloaked Tranche with any type of permission to make such calls, and that such permission was communicated to and reasonably relied on by Plaintiff.  *Id*.

48.    Plaintiff does not know if Charter was even aware of the calls before the instant lawsuit.  *Id.* at 173:11–13, 174:9–12, 175:13–16, 177:5–7, 178:5–7, 180:17–19, 181:17–19; Johnson Dep., vol. II at 22:22–24, 23:14–19, 37:2–4, 39:16–18, 44:22–24, 49:4–6, 51:2–4, 53:7–25, 55:20–23, 57:12–14, 58:2–3, 59:18–20, 60:20–22, 61:9–11.

49.    When Plaintiff called Charter's customer service line in 2019 to complain about outbound calls it allegedly made, the representative Plaintiff spoke

with was confused and informed her Charter's customer service department does not make outbound calls.  Johnson Dep., vol. I at 58:8–14, 59:3–15.

50.    Plaintiff only speculates that the callers were Charter's agents because they mentioned "Spectrum" on some of the calls.  Johnson Dep., vol. I at 149:17–150:3, 158:6–10; Johnson Dep., vol. II at 34:24–35:13, 44:14–18, 49:11–50:2, 51:6–9, 53:10–19, 58:14–16.  But Plaintiff admits that anyone could pretend to be calling from Charter, including herself.  Johnson Dep., vol. II at 46:17–47:12.

51.    Plaintiff did not answer eight of the calls, none of which resulted in a voicemail.  Johnson Dep., vol I, Ex. 3.  At least six of the unknown callers Plaintiff spoke with did not mention Charter at all.  *See, e.g.*, *id.* at 179:23–180:3, Ex. 5.  And Plaintiff offered no evidence as to the substance of two of the calls.  *See id.*, Ex. 5.

52.    Three of the unknown callers Plaintiff spoke with referenced AT&T, a direct competitor of Charter.  Johnson Dep., vol. II at 50:3–23, 54:1–24, 56:10–24.  Four of the unknown callers Plaintiff spoke with provided phony call back numbers (585-928-7025, 415-801-6855, 929-359-4980, 845-203-4744) that are not affiliated with Charter in any way.  Johnson Dep., vol. I at 145:14–18, 164:17–165:6, 176:9–16; Johnson Dep., vol. II at 34:12–14, 57:4–8; Jones Decl. ¶ 17.  Plaintiff does not remember calling these numbers back.  Johnson Dep., vol. I at 145:14–18, 164:17–165:6, 176:9–16; Johnson Dep., vol. II at 34:12–14, 57:4–8.

53.     In all, the 33 calls Plaintiff attributes to Charter displayed 20 numbers on the caller ID.[1]   None of the 20 displayed numbers are Charter outbound telemarketing numbers, meaning they would not be displayed for any Charter outbound telemarketing calls.  Jones Decl. ¶ 15.

54.     18 of the 20 display numbers are not Charter numbers or affiliated with Charter in any way.  *Id.*  Many of those display numbers appear to be mobile numbers (from different telephone carriers) belonging to unknown individuals, while one of the numbers traces back to Uganda.  Howd Decl. ¶¶ 9-10, Ex. D; Johnson Dep., vol. II at 35:24–36:11.

55.     One of the display numbers (800-892-2253, or 800-TWC-ABLE) is an old Time Warner Cable customer service number, which was retired in approximately March 2020, before more than half of the calls even occurred.   Jones Decl. ¶ 15; Jones Dep. 28:7-12, 38:4-13.  Even when in service, it was not used to make Charter outbound telemarketing calls.  Jones Decl. ¶ 15.

56.     One of the display numbers (800-892-4357) is a Charter number for *inbound customer service* calls.  *Id.*  This number is not displayed or used to make Charter outbound calls, much less outbound telemarketing calls.  *Id.*

---

[1] The displayed numbers for the 33 calls were as follows: 800-892-2253, 256-324-0949, 256-177-8169, 256-400-2886, 256-817-5139, 256-444-3878, 256-361-6530, 800-892-4357, 256-86-52581 (Uganda), 845-203-4744, 256-555-3837, 845-203-4950, 256-350-6019, 256-555-3693, 256-385-1643, 256-373-7601, 256-819-5816, 256-428-1346, 256-758-5542, 256-363-9714.  *Id.* at 122:14–123:19, Ex. 3; Howd Decl. ¶ 6.

57.    Caller ID display numbers are often not indicative of the source of a call.  *Id.* ¶ 16.    Indeed, Charter receives complaints about its numbers being "spoofed" (*i.e.*, faked) by unauthorized parties.  *Id.*    Charter has determined on various occasions that fraudsters were posing as "Spectrum" (including by spoofing Charter's numbers) to try and steal consumers' personal information.  *Id.*

58.    The two Charter/Time Warner Cable telephone numbers (800-892-2253 and 800-892-4357) have been associated with such spoofing scams.  Howd Decl. ¶ 12.  Unauthorized parties may have spoofed their Caller ID to display Charter or old Time Warner Cable customer service numbers to make it falsely seem like the caller was calling on behalf of Charter.  *See id.*; Jones Decl. ¶ 16.  Several U.S. District Courts, including this Court, and other government agencies have also fallen victim to similar spoofing campaigns.  Howd Decl. ¶ 13.

59.    Plaintiff has no evidence that the display numbers for the calls were not spoofed by unauthorized persons.  Johnson Dep., vol. II at 71:12–19.

### III.    LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue of material fact."  Fed. R. Civ. P. 56(a).  A factual dispute is "material" only if it might affect the outcome of the lawsuit under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of fact exists only if the evidence is such "that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 252.

Once the moving party identifies a lack of any genuine issue of material fact, the burden shifts to the non-movant to produce "specific facts showing . . . a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## IV.    ARGUMENT AND CITATION OF AUTHORITIES

Charter is entitled to summary judgment because Plaintiff has no evidence to prove any agency theory and for other independent reasons set forth below.

### A.    Plaintiff Cannot Demonstrate Any Theory of Agency Between Charter and the Callers, Precluding Vicarious Liability.

Initially, Plaintiff admits that Charter is not directly liable under the TCPA because Charter did not make or initiate any calls.  SAC ¶ 80, n. 6; *see also, e.g.*, 47 U.S.C. § 227(b)(1)(A)(iii) (prohibits "mak[ing] any call" using an ATDS or PRV); *Cabrera v. Gov't Emps. Ins. Co.*, 452 F. Supp. 3d 1305, 1316 (S.D. Fla. 2014) (no liability under TCPA where defendant did not make or initiate calls); 47 C.F.R. § 64.1200(c)(2) (prohibits "initiat[ing]" certain calls to residential numbers registered on the National DNC Registry); *Palm Beach Golf Ctr. Boca v. Sarris*, 781 F.3d 1245, 1255 (11th Cir. 2015) ("[A] seller does not generally 'initiate' calls made through a third-party telemarketer within the meaning of the TCPA.").

Instead, Plaintiff seeks to hold Charter vicariously liable for calls made by Tranche's subordinates and other unidentified third parties.  SAC ¶ 80, n. 6.  To do so, Plaintiff must prove one of three federal common law agency theories applies: actual agency, apparent authority, or ratification.  *Dish Network*, 28 F.C.C.R. 6574, ¶

28; *Cabrera v. Gov't Emps. Ins. Co.*, 452 F. Supp. 3d 1305, 1317 (S.D. Fla. 2014) (granting summary judgment to TCPA defendant because Plaintiff failed to prove any agency theory applied) (citing *Johnson v. Unique Vacations, Inc.*, 498 F. App'x 892, 895 (11th Cir. 2012)).

Here, Plaintiff has failed to muster any evidence sufficient to establish any theory of agency between Charter and the callers. Indeed, Plaintiff does not even know who made 31 of the 33 calls at issue. And as for the two outbound calls that Tranche's subordinates made, none of the theories of agency apply. Rather, the undisputed evidence *negates* these theories, mandating summary judgment in Charter's favor.

### 1. Charter Did Not Control the Manner and Methods of Tranche's Work, Foreclosing Actual Agency.

Actual agency requires a showing that a principal "manifests assent" to an agent that it act on the principal's behalf and subject to the principal's control. *Wolf v. Celebrity Cruises, Inc.*, 683 F. App'x 786, 797 (11th Cir. 2017) (citation omitted). The "essential element" of an agency relationship is the principal's control over the agent's actions. Restatement (Third) of Agency, § 1.01 cmt. F. In the TCPA context, to establish agency, the principal must exercise control over "the manner and method" of the agent's calling activities. *Cabrera*, 452 F. Supp. 3d at 1317.

Here, Plaintiff cannot prove that Charter exercised the control over Tranche, must less its unidentified subordinates in Pakistan. Far from manifesting assent to

an agency relationship, Charter expressly *disclaimed* any agency relationship with Tranche in its Marketing Agreement.  In relevant part, it states: "The Parties to this Agreement are independent contractors and neither Party shall be deemed an agent, representative, or partner of the other Party."  SUMF 19.  This is "palpable evidence" that no agency relationship existed.  *Commodity Futures Trading Comm'n v. Gibraltar Monetary Corp.*, 575 F.3d 1180, 1189 (11th Cir. 2009).

And apart from the parties' contract, the facts of their relationship confirm no agency relationship existed.  For example, Tranche exercised complete control over its own operations.  It hired, trained, and supervised its own staff; determined the days and hours of its operations; and provided its own office space and equipment necessary to conduct its business.  SUMF 19; *Cabrera*, 452 F. Supp. 3d at 1318 (granting summary judgment because there was no evidence defendant (1) "manifested assent to an agency relationship"; (2) "controlled, or had the right to control, [vendor] in any manner"; or (3) "played any role in the hiring, training, supervising, or disciplining of [vendor's] employees"); *Commodity Futures*, 575 F.3d at 1190 (considering hiring, training, and supervisory and disciplinary authority in determining the existence of an agency relationship).  Tranche did not have access to Charter's marketing database of potential customers, subscriber records, billing systems, or other back-end systems; nor did Charter have access to Tranche's systems.  SUMF 20; *see also Strauss v. CBE Grp.*, 173 F. Supp. 3d 1302, 1310 (S.D.

Fla. 2016) (granting summary judgment where defendant did not give vendor access to its systems, authorize vendor to use its name or trademarks, or know vendor was violating TPCA).

Additionally, Tranche had discretion over how to market Charter's and other entities' services, subject to certain contractual prohibitions, discussed in Section IV.A.2. below.  Charter merely conducted certain quality control measures, such as holding weekly calls with Tranche's president to share market trends, discuss new products and Tranche's performance, and provide reminders of the Marketing Rules. SUMF 32.  Charter also conducted regular audits of call recordings to ensure compliance.  *Id.*  These efforts fall far short of exerting "substantial control" over Tranche's operations.  *See Strauss*, 173 F. Supp. 3d at 1310 (finding quality control measures "such as performing random audits of [vendor's] collection calls, conducting onsite visits every six to nine months, and reviewing collection reports made available by [vendor] through its client portal" were insufficient to create an issue of disputed material fact about nonexistent agency relationship).

Thus, Plaintiff cannot establish that Tranche was more than an independent contractor, foreclosing a theory of actual agency.  *See* SUMF 23 (admitting she has no evidence of relationship between Tranche and Charter).

**2. Tranche's Rogue Subordinates Acted Far Outside of Any Purported Actual Agency Relationship When They Called Plaintiff, Further Precluding Actual Agency.**

Not only did Charter not control Tranche's work, Tranche was also strictly and expressly prohibited from making any outbound telemarketing calls on Charter's behalf. SUMF 15-16. The Marketing Agreement made this explicit. SUMF 15. It also separately required Tranche to comply with the law. SUMF 15. These contractual prohibitions were also *reiterated* through the marketing rules *and* in correspondence from Charter to Tranche. SUMF 16, 32. As such, even assuming an actual agency relationship existed between Charter and Tranche, Tranche's subordinates acted far outside of it when they called Plaintiff—as Tranche's authority was limited to digital marketing through approved websites. SUMF 18. The fact that Tranche was acting outside of its authority is *particularly* emphasized by the fact that Tranche altered a call recording to conceal its contractual violations from Charter. SUMF 41-42. Tranche even conceded in its Answer that its subordinates did this to prevent Charter from finding out about the calls and terminating Tranche, which would have cost them their jobs. SUMF 42.

This independently defeats any actual agency theory. *See*, *e.g.*, *Cordoba v. DIRECTV, LLC*, No. 1:15-CV-3755, 2021 WL 6841777, at *8 (N.D. Ga. Feb. 12, 2021) (where agreement expressly prohibits the activity at issue, the principal cannot be held liable under an actual agency theory). In fact, courts have *repeatedly* rejected

actual authority arguments in TCPA cases where a written agreement *alone* banned the type of communications at issue.  *See, e.g.*, *id.* (granting summary judgment in favor of defendant where "[t]he evidence before the Court establishes that DIRECTV categorically banned all residential and cellular cold calls"); *Paldo Sign & Display Co. v. Wagener Equities, Inc.*, 825 F.3d 793, 798 (7th Cir. 2016) (no actual authority where communications at issue prohibited by parties' agreement).  Thus, any claim of actual agency fails for several, independent reasons.

### 3. Charter Made No Representations to Plaintiff as to Tranche's Authority to Make Outbound Telemarketing Calls, Foreclosing Apparent Authority.

Nor did Charter cloak Tranche with apparent authority to conduct outbound any telemarketing calls.  The Eleventh Circuit applies a three-pronged test to determine whether an agent has apparent authority: "first, a representation by the ***principal to the plaintiff***, which, second, causes the plaintiff reasonably to believe that the alleged agent is authorized to act for the principal's benefit, and which, third, induces the plaintiff's detrimental, justifiable reliance upon the appearance of agency."  *Cordoba*, 2021 WL 6841777, at *7 (quoting *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1252 (11th Cir. 2014); emphasis added).  Only the principal's actions or representations can create apparent authority; the purported agent cannot create apparent authority by his own actions or representations.  *Cabrera*, 452 F. Supp. 3d at 1319–20; *Worsham v. Disc. Power, Inc.*, 2022 WL

3100762, at *8 (D. Md. Aug. 4, 2022), *aff'd*, 2023 WL 2570961 (4th Cir. Mar. 20, 2023); *Thomas v. Taco Bell Corp.*, 582 F. App'x 678, 679 (9th Cir. 2014).

Here, Plaintiff admits that Charter (the alleged principal) never made *any* manifestation or representation to Plaintiff (the third party) about Tranche, much less any manifestation that reasonably led Plaintiff to believe Tranche (the alleged agent) was authorized to make outbound calls. SUMF 47; *Disc. Power*, 2022 WL 3100762, at *8 (granting summary judgment to TCPA defendant and explaining, "a caller's assertion that she represented [defendant] is insufficient standing alone to establish a principal-agent relationship under any applicable agency law theory"). Nor does Plaintiff have evidence that Charter cloaked Tranche with any type of permission to make such calls, and that such permission was communicated to and reasonably relied on by Plaintiff. SUMF 47. Rather, all evidence is to the contrary: Charter explicitly forbade such conduct, several times over. SUMF 15-16, 32. Accordingly, binding Eleventh Circuit authority mandates the conclusion that Charter cannot be vicariously liable under an apparent agency theory.

### 4. Charter Neither Knew About nor Benefited from the Calls, Foreclosing Ratification.

Charter also cannot be liable under a ratification theory. "In order to prove vicarious liability through ratification, the Plaintiff bears the burden of showing: (1) the existence of a principal-agent relationship; (2) that the principal accepted the benefits of the unauthorized act; (3) with full knowledge of the facts under

circumstances demonstrating the intent to adopt the unauthorized agreement." *Cabrera*, 452 F. Supp. 3d at 1320.

Here, as discussed above, there is no principal-agent relationship between Charter and Tranche, and thus there can be no ratification. *See, e.g.*, *id.* (citing *Thomas*, 582 F. App'x at 680 ("principal-agent relationship is [] a requisite, and ratification can have no meaning without it.")). This fact is alone dispositive.

But even if it were not, Plaintiff also admits that Charter did not receive any benefit from *any* of the calls, as also required to state a claim for ratification. SUMF 26; *see also Cordoba*, 2021 WL 6841777, at *7; *Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 cv 5601, 2014 WL 7717584, at *6 (N.D. Il. Nov. 21, 2014), *aff'd*, 816 F.3d 935, 939 (7th Cir. 2016). In fact, Plaintiff only identifies the alleged caller for *two* of the calls: Tranche. SUMF 2, 41. And she cannot show that Charter ever benefited from any outbound calls by Tranche, much less ones that it knew about. SUMF 26. Instead, Charter was sued, to its substantial detriment, and was left holding the bag for litigation costs when Tranche defaulted on its contractual obligation to indemnify Charter for its admitted contractual breaches. Thus, Plaintiff cannot establish any of the requisite elements of ratification.

## B. Plaintiff Cannot Establish the Calls Were Made Using an ATDS or PRV.

To establish liability under TCPA 47 U.S.C. § 227(b), Plaintiff must establish that each call used an ATDS or played a PRV. *See Wijesinha*, 387 F. Supp. 3d at

1414; *Simpson v. Deutsche Bank Nat'l Tr. Co.*, 2020 WL 6081964, at *2 (N.D. Ala. Oct. 15, 2020); *Ybarra v. Dish Network*, 807 F.3d 635, 640 (5th Cir. 2015).  An ATDS is a system that "in all cases, whether storing or producing numbers to be called . . . must use a random or sequential number generator." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1170 (2021).

Here, Plaintiff cannot establish an ATDS was used, thus warranting summary judgment in Charter's favor on her ATDS claim.  Plaintiff admittedly has no evidence or knowledge of how the calls were made, or what dialing systems were used.  SUMF 5.  *Simpson*, 2020 WL 6081964, at *2 (granting summary judgment where plaintiffs "ha[d] not presented any evidence [defendant] called them at all, much less that it used a system that qualifie[d] as an [ATDS]").

And Charter is entitled to summary judgment as to 13 calls on her PRV claim because Plaintiff only produced any evidence that 20 of the calls employed a PRV. SUMF 5; *Ybarra*, 807 F.3d at 640 ("To be liable under the 'artificial or prerecorded voice' section of the TCPA [the] artificial or prerecorded voice must actually play.").

## C.  Plaintiff's DNC Claim Also Fails Because She Cannot Establish that the Calls Were Made on Charter's Behalf.

For her DNC claim, Plaintiff bears the burden to show she received at least two marketing calls "by or on behalf of" Charter within any 12-month period on a telephone number registered with the National DNC Registry.  47 U.S.C. § 227(c)(5); 47 CFR § 64.1200(c)(2); *Meadows v. Franklin Collection Serv., Inc.*,

414 F. App'x 230, 235 (11th Cir. 2011); *Worsham v. TSS Consulting Grp., LLC*, 2023 WL 5016558, at *3 (M.D. Fla. Aug. 7, 2023).

Because Plaintiff cannot show any calls "by" Charter, she must prove she received calls "on behalf of" Charter.  In other words, she must prove vicarious liability to pursue a DNC claim against Charter, and she hasn't done that, as explained in Section IV.A. above.  *See, e.g.*, *TSS Consulting*, 2023 WL 5016558, at *3 (granting summary judgment to TCPA defendant where plaintiff failed to prove "an agency relationship between defendant and the party placing the call") (collecting cases).  Her DNC claim fails in its entirety for this reason.

But it also fails for another reason: DNC claims are unique in that Plaintiff must show receipt of *more than one* call in 12 months on behalf of Charter to have a private cause of action under 227(c).  Here, she only offers admissible evidence connecting one of the calls to Charter—the evidence being an order entered into Charter's SOM by Tranche.  SUMF 25, 28.  And while some of the other calls *might* have been made by Tranche, Plaintiff hasn't mustered any admissible evidence that the remaining calls were in fact made by Tranche or anyone who actually sold Charter services.[2]  So even setting aside Plaintiff's dispositive failure

---

[2] Plaintiff offers only the statements of Tranche in its unsworn answer (ECF 123) and the statement of unidentified third parties claiming to be "Spectrum," neither of which is evidence against Charter.  SUMF 50; *see* Fed. R. Evid. 801(c) (noting statements by unavailable declarant offered to prove the truth of the matter asserted are inadmissible hearsay); *HSNi, LLC v. Croton Watch Co.*, 2019 WL 8273646, at *5, R&R adopted, 2019 WL 8273651 (M.D. Fla. Sept. 24, 2019) (finding statement inadmissible where proponent failed to identify declarant or lay proper

to prove vicarious liability as to any calls (including any made by Tranche), which precludes liability on any TCPA claim, she also fails to state a private cause of action under 227(c)'s unique "two calls or more calls in twelve months" rule. *See* 47 U.S.C. § 227(c)(5); *Meadows*, 414 F. App'x at 235.

Even if that were so, she could only recover for 28 of the calls because the first five calls were made before Plaintiff registered her telephone number. SUMF 5; 47 CFR § 64.1200(c)(2) (prohibiting certain calls to a "residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry").

Accordingly, Plaintiff's DNC claim fails, multiple times over.

## D.    Plaintiff's Request for Injunctive Relief Fails as a Matter of Law.

Any injunction is also improper in this case as Plaintiff has an adequate remedy at law under the TCPA: statutory damages. *See* 47 U.S.C. § 227(b)(3) (statutory damages up to $1,500 for each willful or knowing violation, and $500 or greater for other violations of the statute); *Gubala v. Time Warner Cable Inc.*, No. 15-CV-1078-PP, 2016 WL 3390415, at *7 (E.D. Wis. June 17, 2016). Injunctive relief is not available when a party has an adequate remedy at law. *See* 47 U.S.C. § 227(b)(3); *Northern California Power Agency v. Grace Geothermal Corp.*, 469

---

foundation to show declarant was acting as an agent or within the scope of an agency relationship) (collecting cases).

U.S. 1306 (1984).  Further, Plaintiff would receive no relief from an injunction here where: (1) neither Charter nor anyone on its behalf made the calls; (2) Tranche was long ago terminated by Charter; and (3) Plaintiff doesn't claim to have received any calls referencing Spectrum services in two years.  Thus, Plaintiff's claim for injunctive relief is also moot.  *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016) (claim moot because there was "no reasonable expectation that the alleged violation will recur") (quot. marks omitted).

## IV.   CONCLUSION

Plaintiff concedes that Charter did not call her, foreclosing direct TCPA liability.  And Plaintiff has no evidence to prove any agency theory, foreclosing vicarious TCPA liability.  To start, the one caller Plaintiff claims to have identified, Tranche, was not Charter's agent, thus precluding actual agency and ratification. Even assuming this were not so, Tranche had no actual authority to perform the complained-of acts because it was expressly forbidden from making any outbound telemarketing calls.  Tranche also had no apparent authority because Charter made no representations to Plaintiff about Tranche, much less any representations that Plaintiff relied on to her detriment.  And Charter could not ratify the calls it neither knew about nor benefitted from.  For these and the other reasons explained above, Charter respectfully requests that the Court grant its Renewed Motion for Summary Judgment.

Dated:  August 21, 2023

By: */s/ Ryan D. Watstein*
  Ryan D. Watstein (*admitted pro hac vice*)
  ryan@wtlaw.com
  Abigail L. Howd (*admitted pro hac vice*)
  ahowd@wtlaw.com
  WATSTEIN TEREPKA LLP
  1055 Howell Mill Road, 8th Floor
  Atlanta, Georgia 30318
  Tel: (404) 418-8307
  Fax: (404) 537-1650

  Wesley B. Gilchrist
  wgilchrist@lightfootlaw.com
  Mary Parrish McCracken
  mmccracken@lightfootlaw.com
  LIGHTFOOT, FRANKLIN & WHITE
  L.L.C.
  The Clark Building
  400 North 20th Street
  Birmingham, Alabama 35203-3200
  Telephone: 205-581-0700
  Facsimile: 205-581-0799
  *Counsel for Charter Communications, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 21, 2023, I caused a true and correct copy of the foregoing document to be filed with the Clerk of Court by using the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<u>/s/ Ryan D. Watstein</u>
Attorney for Defendant